## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---------------------------------------------------------X

SOCLEAN, INC.

      Plaintiff,

          against                   Case No. 1:20-cv-10351-IT

SUNSET HEALTHCARE SOLUTIONS, INC.,

      Defendant.

---------------------------------------------------------X


## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
## <u>PLAINTIFF'S EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION</u>


Andrea L. Martin
BURNS & LEVINSON LLP
125 High Street
Boston, MA 02110
617-345-3000

*Attorney for Defendant*

# Table of Contents

Table of Authorities ................................................................................................................ iii

Preliminary Statement ............................................................................................................. 1

Factual Background ................................................................................................................. 2

I.       Sunset and the CPAP Cleaning Device Market ................................................................ 2

II.     The Sunset-SoClean Relationship ................................................................................ 3

III.    Sunset Develops and Launches a CPAP Cleaning Device:  the Zoey .............................. 5

IV.   Sunset Will Be Irreparably Harmed if the Court Grants SoClean's Motion. ................... 6

Argument ................................................................................................................................. 7

I.       SoClean Has Not Made A "Clear Showing" That It Is Entitled To A Preliminary
         Injunction ..................................................................................................................... 7

II.     A.Substantial Question Exists as to Sunset's Purported Infringement of the '205 Patent . 9

         A.     Claim Construction ............................................................................................. 9

         (1)    "a wall" ............................................................................................................. 9

         (2)    "through" ........................................................................................................ 10

         (3)    "disposed within" ........................................................................................... 11

         B.     Sunset Does Not Infringe the Asserted Claims of the '205 Patent ...................... 11

III.    SoClean's Conclusory Assertions Do Not Amount to a Clear Showing that Immediate
         Irreparable Harm Is Likely. ........................................................................................ 13

         A.     SoClean's "Lost Market Share" Theories Are Unsupported. .............................. 14

         (1)    The Parties market and sell primarily in different channels. .............................. 14

         (2)    SoClean's "lost sales" argument is unsupported. .................................................. 15

         B.     SoClean's Price Erosion Claim Is Wholly Conclusory. ...................................... 17

         C.     References to Loss of Goodwill and Reputational Injury are Conclusory. .......... 18

IV.   The Balance of Hardships Favors Denial of a Preliminary Injunction. ........................... 18

V.     The Public Interest in Health Favors Denial of a Preliminary Injunction. ...................... 20

Conclusion ............................................................................................................................ 20

**Table of Authorities**

Page(s)

**Federal Cases**

*Abbott Labs. v. Andrx Pharm., Inc.*,
452 F.3d 1331 (Fed. Cir. 2006)................................................................14, 15, 18

*Acumed LLC v. Stryker Corp.*,
551 F.3d 1323 (Fed. Circ. 2008).............................................................17

*Advanced Cardiovascular Sys. v. Medtronic Vascular, Inc.*,
579 F. Supp. 2d 554 (D. Del. 2008)........................................................16

*Apple Inc. v. Samsung Electronics Co., Ltd.*,
809 F.3d 633 (Fed. Cir. 2015).................................................................17

*Automated Merch. Sys. v. Crane Co.*,
357 F. App'x 297 (Fed. Cir. 2009) ..........................................................17

*Biogen Idec MA Inc. v. Trustees of Columbia Univ.*,
332 F. Supp. 2d 286 (D. Mass. 2004) .....................................................14

*Broadcom Corp. v. Emulex Corp.*,
732 F.3d 1325 (Fed. Cir. 2013)...............................................................18

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012).................................................................17, 19

*Contour Design, Inc. v. Chance Mold Steel Co., Ltd.*,
2010 U.S. LEXIS 121761 (D.N.H. 2010).................................................18

*Douglas Dynamics, LLC v. Buyers Products Co.*,
717 F.3d 1336 (Fed. Cir. 2013)...............................................................18

*Edge–Works Mfg. Co. v. HSG, LLC*,
285 F. Supp. 3d 883 (E.D.N.C. 2018).....................................................15, 16, 18, 19

*iRobot Corporation v. SharkNinja Operating LLC*,
No. 19-cv-12125-ADB, 2019 WL 7578466 (D. Mass. Nov. 26, 2019) ....................8

*LEGO A/S v. ZURU Inc.*,
No. 3:18-cv-02045-AWT, 2020 WL 229874 (Fed. Cir. Jan. 15, 2020) .......................7, 13, 16

*Mallinckrodt, Inc. v. Masimo Corp.*,
147 Fed.Appx. 158 (Fed. Cir. 2005)........................................................20

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) (*per curiam*) ........................................................................7

*MercExchange, L.L.C. v. eBay, Inc.*,
401 F.3d 1323 (Fed. Cir. 2005)..............................................................................20

*Metalcraft of Mayville, Inc. v. The Toro Company*,
848 F.3d 1358 (Fed. Cir. 2017)................................................................................8

*MicroStrategy Inc. v. Business Objects, S.A.*,
429 F.3d 1344 (Fed. Cir. 2005)..............................................................................11

*Netword, LLC v. Centraal Corp.*,
242 F.3d 1347 (Fed. Cir. 2001)..............................................................................11

*Nutrition 21 v. U.S.*,
930 F.2d 867 (Fed. Cir. 1991)..........................................................................14, 17

*Oakley, Inc. v. Sunglass Hut Int'l*,
316 F.3d 1331 (Fed. Cir. 2003)...........................................................................9, 11

*Oxford Immunotec Ltd. v. Qiagen, Inc.*,
271 F. Supp. 3d 358 (D. Mass. 2017) .......................................................13, 17, 20

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)................................................................................9

*Praxair, Inc. v. ATMI, Inc.*,
479 F. Supp. 2d 440 (D. Del. 2007).......................................................................14

*Precision Automation, Inc. v. Tech. Services, Inc.*,
No. 07-cv-707-AS, 2007 WL 4480739 (D. Or. Dec. 14, 2007) ......................17, 19

*Precision Links Inc. v. USA Products Group, Inc.*,
527 Fed. App'x. 852 (Fed. Cir. 2013)....................................................................16

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
702 F.3d 1351 (Fed. Circ. 2012)............................................................................18

*Red Bend Ltd. v. Google Inc.*,
2011 U.S. Dist. LEXIS 36217 (D. Mass. Mar. 31, 2011)
.................................................................................................................14, 15, 17, 18

*Sanofi-Synthelabo v. Apotex, Inc.*,
470 F.3d 1368 (Fed. Cir. 2006)..............................................................................19

*Smith & Nephew, Inc. v. Interlace Med., Inc.*,
955 F. Supp. 2d 69 (D. Mass. 2013) (cited by SoClean, Mot. ) .............................20

*State Indus. v. A.O. Smith Corp.*,
    751 F.2d 1226 (Fed. Cir. 1985)...............................................................................................19

*Takeda Pharmaceuticals U.S.A., Inc. v. West-Ward Pharmaceutical Corp.*,
    785 F.3d 625 (Fed. Cir. 2015)..................................................................................................8

*Titan Tire Corp. v. Case New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009).................................................................................................8

*TransCore, LP v. Elec. Transaction Consultants Corp.*,
    563 F.3d 1271 (Fed. Cir. 2009)...............................................................................................13

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
    748 F.3d 1159 (Fed. Cir. 2014)...............................................................................................18

Defendant Sunset Healthcare Solutions, Inc. ("Sunset") respectfully submits this memorandum of law, along with the Declarations of Chris Slosar ("Slosar Decl."), Andrea Martin ("Martin Decl."), and Dr. Michael Liebschner ("Liebschner Decl.") in opposition to the motion by Plaintiff SoClean, Inc. ("SoClean"), for a preliminary injunction (the "Motion").

## Preliminary Statement

SoClean has failed to satisfy the exacting standard for a preliminary injunction, which is a drastic and extraordinary remedy saved for the clearest cases. SoClean relies on conclusory claims of irreparable harm and unfounded charges of patent infringement in an effort to quash legitimate competition by a small competitor. SoClean seeks an order essentially giving it a monopoly on a standalone automated CPAP cleaning device based solely on an unsupported allegation that Sunset infringes its patent on a certain type of connector through which ozone is provided into the cleaning device. Sunset does not infringe the asserted claims related to this connector: SoClean's claimed connector unit uses a "second passageway" configured to pass through the wall of the connector to inject ozone directly into the reservoir of the CPAP machine. Sunset's device does not. At a minimum, Sunset has raised a "substantial question" on the issue of infringement. SoClean has thus failed to meet its burden to establish a likelihood of success on the merits.

Nor has SoClean met its burden on the remaining three injunction factors. Its claims of irreparable harm are wholly conclusory and speculative, and belied by the actual facts. SoClean suggest that Sunset's distributorship with SoClean was a ruse for Sunset to exploit SoClean's sales channel; but it was actually Sunset that, years ago, introduced SoClean to *Sunset's* customers in the Durable Medical Equipment (DME) sales channel. Far from a "knock off" product, Sunset developed a competing standalone automated CPAP cleaning device, after investment of substantial time, effort and expense, resulting in a more user-friendly device. And SoClean has presented no *facts* that show it has been or will be irreparably harmed by Sunset's modest sales of

its product in a resoundingly different channel. SoClean – unquestionably the market leader – sells primarily directly to consumers and to mass retailers (such as Walmart), whereas Sunset is a small, new entrant in an increasingly competitive market that *does not sell at all in these channels*. Nor has SoClean made a "clear showing" that the balance of hardships tips in its favor, or that an injunction in these circumstances – where a small competitor has brought to market an innovative medical device – serves the public interest.

## Factual Background

### I.      Sunset and the CPAP Cleaning Device Market

Sunset is a Chicago-based national manufacturer and distributor of home medical equipment supplies, specializing in respiratory products, such as masks, filters, connectors, nebulizers, tubing, headgear, cleaners and accessories for CPAP and other breathing devices. (Slosar Decl. ¶ 2.) Over the last 15 years, Sunset has established a national presence with its small business ethos:  selling affordable, high quality products with exceptional, personalized service. (*Id.* ¶ 3.) Two of the company's current principals started the business in 2004. The company currently employs 85 people and has been on Inc. Magazine's "5000 List" of the fastest growing privately-held companies in the United States for at least eight years. (*Id.* ¶ 4.) Approximately 50% of Sunset's business is the manufacture and sale of its own products, with the other half being distribution of other equipment manufacturers' products, such as SoClean. (*Id.* ¶ 5.)

While some companies in the respiratory products industry, such as SoClean, sell directly to consumers, Sunset sells products it manufactures and that it distributes for other manufacturers *solely* to retail Durable Medical Equipment companies ("DMEs") (also known as Home Medical Equipment companies, or "HMEs").  The DMEs, in turn, sell these products to the consumer. Through its reputation for quality and customer service, Sunset has built a network of over 1,600 DMEs.  Sunset is well respected by its customers and employees, and is a well-known small

business in the industry – it has attended the annual Spring and Fall Medtrade tradeshows since the company's inception in 2004.  (Slosar Decl. ¶ 6.)

The CPAP cleaning device market has become increasingly competitive, with numerous products available to consumers – either directly from the manufacturers or through DMEs.  The top competitors in the industry are SoClean, Sleep 8, and Lumin, followed by at least a dozen others.  (Slosar Decl. ¶ 7.)  There are a number of designs and types of CPAP cleaning devices – some use activated oxygen (or ozone) to sanitize, others use ultraviolet light, some are standalone, others require some or all CPAP disassembly.  Sunset estimates that the CPAP cleaning device market has grown to well over $150 million in annual revenues.  (*Id.* ¶ 8.)

## II.     The Sunset-SoClean Relationship

In March 2014, at the Medtrade Tradeshow, SoClean approached Sunset about becoming a distributor for SoClean's CPAP cleaning device.  At that time, SoClean had virtually no salesforce and only a small regional distributorship through which it sold to DMEs.  SoClean was particularly interested in distributing through Sunset given Sunset's vast DME network.  A month later, in April 2014, Sunset placed its first order to distribute SoClean's device.  (Slosar Decl. ¶ 9.)

The parties thereafter worked together on a "handshake" basis until April 2019, and over the course of the parties' relationship, Sunset has sold millions of dollars of SoClean product to its DME customers.  (Slosar Decl. ¶ 10.)  During the parties' relationship, Sunset did not learn or obtain confidential information about SoClean's sales or marketing strategy, or its pricing/MAP strategy.  In the ordinary course of their business relationship, Sunset would receive non-confidential distributor and MSRP price lists.  (*Id.* ¶ 11.)

In addition to selling to DMEs through Sunset, SoClean sold product directly to some of Sunset's DME customers, offering promotions if the customer purchased directly from SoClean.  (Slosar Decl. ¶ 12 & Ex. 1 thereto.)  As SoClean's business grew, it sold an increasingly greater

percentage of product directly to consumers, targeting its television advertising directly at this market.  As it did so, some of Sunset's DME customers complained to Sunset that SoClean's direct advertising was adversely impacting their business, that SoClean treated them poorly given the two-tier pricing involved in selling through DME's (SoClean to DME, and DME to end user), and expressed an interest in having an alternative to SoClean's offering.  (Slosar Decl. ¶ 13.)

In late 2017, SoClean was purchased by DWHP, a Toronto-based healthcare private equity firm.  In early 2018, DWHP expressed interest in acquiring Sunset's business; Sunset responded that it was not interested in selling.  Shortly thereafter, SoClean began demanding that Sunset pre-pay for the product to be sold to Sunset's customers.  Sunset also saw a marked decrease in its gross profits on SoClean sales, as a result of SoClean's changed pricing requirements.  (Slosar Decl. ¶ 14.)  In early 2019, for the first time in the parties' relationship, SoClean insisted that Sunset sign a distribution agreement, which Sunset did in April 2019.  (*Id.* ¶ 15.)[1]

In December 2018, SoClean announced its international expansion to bring its products "directly to consumers in key international markets"; having expanded to the U.K. and Canada in 2018, it announced its intent to expand to France, Germany, Italy, Spain, Japan and Australia, so that it could sell directly to consumers in these markets as well.  (Martin Decl., Ex. 1.)  In September 2019, SoClean announced a new worldwide "expanded distribution strategy", in which it claimed to have "dramatically expanded its distribution to reach millions of potential new customers worldwide", through partnerships with major retailers in the U.S., U.K. and Canada, including Walmart.  (*Id.*, Ex. 2.)  And on December 11, 2019, SoClean announced its expansion into the Asia-Pacific market, noting Asia-Pacific accounts for almost 60% of the global population,

---

[1]  SoClean entirely ignores the parties' long relationship before it insisted Sunset sign this distributorship agreement, apparently intending to convey the false impression that SoClean's "upstart" distributor swooped in, stole its product and began selling it in *SoClean*'s sales channels.

"which is why SoClean believes strategically there is a huge opportunity to bring its products for sleep equipment maintenance to this market."  (*Id.*, Ex. 3.)  As of September 2019, only 9% of SoClean's "B2B" sales were to DMEs.  (Slosar Decl. ¶ 16 & Ex. 2 thereto.)

On December 10, 2019 (the day before it announced its Asia-Pacific expansion), SoClean notified Sunset that it was terminating its distributorship (effective February 9, 2020), and that a new agreement would be forthcoming.  (Slosar Decl. ¶ 17 & Ex. 3 thereto.)[2]  Notwithstanding the notice of termination, SoClean provided a 2020 price list to Sunset.  (*Id.* & Ex. 5 thereto.)  SoClean never provided a new distribution agreement to Sunset (*id.* ¶ 17), and filed this lawsuit instead. On information and belief, SoClean is approximately 2.5-3.5 times larger than Sunset.  (*Id.* ¶ 18.)

## III.    Sunset Develops and Launches a CPAP Cleaning Device:  the Zoey

In July 2018, Sunset began developing a CPAP cleaning device – what ultimately launched as the Zoey.  Sunset worked with a design company and other consultants to design and develop an aesthetically-pleasing, user friendly cleaning device, with high-end packaging that would appeal to DMEs and their customers.   (Slosar Decl. ¶ 19.)   After extensive development (mechanical, electrical, tooling and circuit board), testing and a comprehensive UL audit for regulatory compliance, by the end of December 2019, Sunset had manufactured its first 500 devices.  Thus, after approximately 18 months of significant development effort and an investment of hundreds of thousands of dollars (exclusive of labor costs), Sunset launched Zoey in January 2020, and made its first sale on January 15, 2020.  (*Id.* ¶ 20.)

While the Zoey is a system that cleans CPAP masks, headgear, tubing, and humidifiers, there are a number of differences designed to make it appealing to end users as compared to the

---

[2] While irrelevant to this motion, SoClean suggests that it terminated the distributor agreement because of a purported breach by Sunset for selling product to a single customer at prices below MAP.  (Marcarelli Decl. ¶¶ 22-24.)  But on September 19, 2019, Sunset had already notified SoClean that it had terminated its relationship with this customer.  (Slosar Decl., Ex. 4.)

SoClean.  It is quieter in operation, aesthetically different, and appealing for display in users' homes, has a different screen (using LED lighting), enhanced safety features, easy to navigate controls, and premium packaging to differentiate it from competitors.  (Slosar Decl. ¶ 21.)

In addition, as described more fully below, the Zoey provides ozone into the cleaning system in a fundamentally different way than the SoClean device.  While the SoClean flows ozone from the ozone generator directly into the water reservoir of a CPAP machine humidifier, the Zoey directs ozone flow into the CPAP mask hose and directionally away from the CPAP reservoir.  As a result, the Zoey also has a materially different ozone connector.   (Slosar Decl. ¶ 22.)

As with its other products, Sunset's Zoey is a DME-exclusive item – *i.e.*, consumers can purchase it only through authorized DMEs, and not directly from Sunset, or online resellers (such as Amazon), or from mass retailers such as Walmart.  (Slosar Decl. ¶ 23.)   Based on its experience in the industry and market research and analysis, Sunset set its end user price at $299 (higher than some devices in the market, and lower than others).  (*Id.* ¶ 24.)  Unlike SoClean, Sunset does not advertise its CPAP cleaning device on TV (as Sunset does not sell directly to consumers).  (*Id.* ¶ 25.)  Since its launch in January, Sunset has sold approximately 420 units.  (*Id.* ¶ 26.)

## IV.     Sunset Will Be Irreparably Harmed if the Court Grants SoClean's Motion.

Sunset will be irreparably harmed if it is forced to shut down manufacturing of the Zoey while the lawsuit is pending.  Its manufacturer in China is the key supplier, who has hired and trained a number of people specifically for manufacture of the Zoey.  (Slosar Decl. ¶ 27.)  One of Sunset's longtime suppliers in the manufacturing/supply chain is Sunset's *largest* supplier when considering all of Sunset's products.  For just the Zoey, it has invested in building space, the hiring and training of employees, product development and has placed deposits with a number of sub-contractors.  If preliminary enjoined from selling Zoey, Sunset would lose a substantial amount of

trust and credibility with this critical supplier to Sunset's overall business, which risks interrupting the supply chain for Sunset products not at issue in this lawsuit.  (*Id.* ¶ 28.)

Sunset will also lose credibility and goodwill with its DME customers, who trust that Sunset will deliver on its product offerings; its inability to do so here will adversely impact its relationship with its sole DME sales channel.  (Slosar Decl. ¶ 29.)  In addition, Sunset is a longtime attendee of the annual Medtrade tradeshows, and is well-known and respected by other attendees. If Sunset is unable to launch the Zoey at the upcoming Medtrade tradeshow because of an injunction, it will likely suffer reputational harm in the industry.  (Slosar Decl. ¶ 30.)

Finally, Sunset has cultivated a positive, employee-friendly culture.  Approximately ten employees are dedicated to the launch and sale of the Zoey, and if a preliminary injunction is entered, Sunset will likely have to lay off some of its staff.  This would have an extremely detrimental impact on employee morale, exacerbated by the relatively small size of Sunset's business operations.  (Slosar Decl. ¶ 31.)

<u>Argument</u>

**I.  SoClean Has Not Made A "Clear Showing" That It Is Entitled To A Preliminary Injunction**

To obtain a preliminary injunction, the plaintiff "must establish 'that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'"  *See LEGO A/S v. ZURU Inc.*, No. 3:18-cv-02045-AWT, 2020 WL 229874, at *2 (Fed. Cir. Jan. 15, 2020) (citations omitted).  The Supreme Court has stressed that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*).  "[T]he Federal Circuit has . . . built a body of precedent applying the general preliminary

injunction considerations to a large number of factually variant patent cases, and gives dominant effect to Federal Circuit precedent insofar as it reflects considerations specific to patent issues." *Metalcraft of Mayville, Inc. v. The Toro Company*, 848 F.3d 1358, 1363 (Fed. Cir. 2017).

A patentee's entitlement to a preliminary injunction is within the trial court's discretion. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375–76 (Fed. Cir. 2009). If a defendant "raises a substantial question concerning either infringement or validity, i.e., asserts an infringement or validity defense that the patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *See iRobot Corporation v. SharkNinja Operating LLC*, No. 19-cv-12125-ADB, 2019 WL 7578466, at *1-3, 9 (D. Mass. Nov. 26, 2019) (citation omitted); *Takeda Pharmaceuticals U.S.A., Inc. v. West-Ward Pharmaceutical Corp.*, 785 F.3d 625, 630 (Fed. Cir. 2015) (same substantial question standard).[3]

Here, Sunset has *at least* raised a "substantial question" as to its alleged infringement, and therefore the preliminary injunction should not issue. While the question should end there, SoClean has also not made a "clear showing" that it will suffer irreparable harm absent a preliminary injunction, that the balance of hardships weigh in its favor, or that a preliminary injunction is in the public interest. SoClean's Motion should be denied.

---

[3] SoClean incorrectly states "[a] defendant cannot defeat a preliminary injunction merely by raising 'substantial questions'" (Mot. at 8), citing *Abbott Labs v. Sandoz, Inc*., but SoClean quotes from Part VI of that decision, which was not joined by the other two judges on the panel and therefore does not reflect a majority opinion. *See* 544 F.3d 1341, 1343 (Fed. Cir. 2008). SoClean also relies on the same non-majority portion of *Abbott Labs* to assert that the preliminary injunction standard is not unique to patent law and that regional circuit law applies. (Mot at 8.) In any event, SoClean does not articulate any substantive difference between the First Circuit and Federal Circuit preliminary injunction standards.

## II.   A Substantial Question Exists as to Sunset's Purported Infringement of the '205 Patent

SoClean's Motion should be denied because Sunset does not infringe the asserted claims. At minimum, under the two-step infringement analysis, *see Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003), Sunset has presented a substantial question as to infringement.

### A.   Claim Construction[4]

On the first step of the infringement analysis, the court determines the scope and meaning of the claim terms, *see Oakley*, 316 F.3d at 1339, which are "generally given their ordinary and customary meaning," that is, the meaning that "a person of ordinary skill in the art in question at the time of the invention" would give to the term, read "in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (internal quotation omitted).  The Court may also consider "extrinsic evidence", *i.e.*, evidence outside of the patent and prosecution history, such as expert testimony, *id.* at 1313, which "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand the claim terms to mean", *id.* at 1319.

### (1)   "a wall"

The term "a wall" as used in claims 1 and 11 should be construed to mean "a single structure having a pair of opposed surfaces and a thickness", based on its plain and ordinary meaning of the term in light of the '205 Patent's specification.  (*See also* Liebschner Decl. ¶¶ 79-84.)  Claim 1 requires that "said wall extends between the first end and the second end", which suggests that the "wall" is formed of a single structure between the two ends of the connector unit. Although the specification of the '205 Patent does not mention "wall" anywhere in the detailed description, the figures and the detailed description refer to the connector unit as a singular entity.

---

[4] Sunset expressly reserves all invalidity arguments including those under 35 U.S.C. §112.

*See, e.g.*, Figs. 2, 6-7; col. 4:17-25.

**(2)    "through"**

The claim term "through" as used in claims 1 and 11 should be construed to mean "moving in one side and out of the other side of" an object, based on the plain and ordinary meaning of the term in light of the '205 Patent's specification.  (*See also* Liebschner Decl. ¶¶ 85-93.)   Claim 1 states that "the second passageway extends through the wall".  As used in this context, the term "through" would mean that the second passageway which delivers the ozone enters the wall of the connector unit from the outside, and exits on the inside of the wall within the connector.  As seen in the annotated Figure 2 (below), the second passageway (218) enters the wall on the right side of the outer side of the connector unit, goes past the wall, and comes out of the inner side.

**Figure 2**



In describing Figure 2, the specification states:

"In accordance with this embodiment the ozone distribution line 218 is shown connected through the CPAP connector unit 230, at a ninety degree angle, and into the water reservoir 222."

*See* col. 4:22-25

Thus, the proper construction of the term "through" means "moving in one side and out of the other side of" an object.  This construction is also supported by the SoClean 2 device.  Plaintiff asserts that the SoClean 2 device embodies claim 1 of the '205 Patent.  As seen in the image below, the connector unit of the SoClean 2 device has a second passageway for ozone to flow through. The second passageway enters on one side of the wall of the connector unit and goes out the other side of the wall into the space within the connector unit before curving 90 degrees:



### (3)     "disposed within"

The claim term "disposed within" as used in claims 1 and 11 should be construed to mean "inside of" an object, based on the plain and ordinary meaning of the term in light of the '205 Patent's specification.   (*See also* Liebschner Decl. ¶¶ 94-101.)   Claim 1 states "the second passageway extends through the wall and is at least partially disposed within the first passageway." This claim limitation describes a situation where the second passageway (which is a space) is enclosed in the first passageway (which is another space).   As seen in Figure 2 and the photos above of the SoClean, the line carrying ozone (second passageway) is enclosed inside of the first passageway; meaning that the empty space defined as the first passageway allows the gas to flow around the second passageway.

### B.     Sunset Does Not Infringe the Asserted Claims of the '205 Patent

The second part of the infringement analysis involves comparing the properly construed claims to the allegedly infringing device.   *Oakley*, 316 F.3d at 1339. "To establish literal infringement, all of the elements of the claim, as correctly construed, must be present in the accused system."   *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1353 (Fed. Cir. 2001).  "If … even one claim limitation is missing or not met, there is no literal infringement."   *MicroStrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1352 (Fed. Cir. 2005).

As the Zoey connector does not have a second passageway that is "at least partially disposed within the first passageway" and does not have a second passageway that "extends

through the wall" between the first end and the second end, the Zoey device does not infringe claims 1 and 11. The patent's requirement that the "second passageway [the ozone distribution tube] extends through the wall" of the connector is illustrated in Figure 2 of the '205 Patent as well as in the images of the SoClean connector unit shown above. In contrast, the Zoey device operates differently. Sunset designed the Zoey device to more efficiently deliver ozone gas by using a two-piece design that directly delivers ozone gas to a CPAP hose (not directly into the CPAP reservoir using a second passageway as in the SoClean). Sunset delivers the gas without going through the wall of a unitary connector piece. This two-piece design is shown in the annotated cross section of the tube connector of Zoey device is illustrated below:



(Liebschner Decl. ¶ 104.) As shown, the left side of the first piece—the main body of the connector, with the wall illustrated in green—connects to the end of the CPAP device. (*Id.* ¶¶ 64, 65, 105.) A second piece— with a portion illustrated in orange—connects to an ozone supply tube to deliver ozone directly to the hose end, with ozone flowing through the area illustrated in pink directly into the hose end. (*Id.* ¶¶ 65-70.) Notably, no portion of this pink area in the second piece extends through the (green) wall, nor is it disposed within the passageway that connects the CPAP end to the hose end (blue). (*Id.* ¶¶ 105-107.)

As the Zoey connector neither has a second passageway that "extends through the wall" between the first end and the second end, nor has a second passageway that is "at least partially disposed within the first passageway," the Zoey cannot infringe the asserted claims. (*Id.* ¶¶ 108,

118-120.) At a bare minimum, the lack of these claim elements in the Zoey connector presents a "substantial question" as to infringement that precludes a preliminary injunction.

### III.   SoClean's Conclusory Assertions Do Not Amount to a Clear Showing that Immediate Irreparable Harm Is Likely.

SoClean claims that because it has spent a lot of money marketing the SoClean 2, it "has created a market for automated CPAP disinfecting devices and deserves to have its exclusive right to prevent others from practicing its invention protected."  (Mot. at 14.)  But regardless of the amount it has spent on advertising, it is not entitled to "exclusivity" on automated disinfecting devices; it is entitled to exclusivity with respect to the patented invention it is asserting in this Motion: a connector unit through which ozone is provided into the cleaning device.[5]  *See TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009) (patent law provides only a "limited right" to patentees to exclude others from patented invention). That aside, SoClean's contentions that it will suffer irreparable harm in the form of lost market share, price erosion and loss of goodwill are unsupported by actual evidence; its speculative and conclusory assertions do not entitle it to the "drastic remedy" of a preliminary injunction.

"As the Supreme Court has explained, '[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Oxford Immunotec Ltd. v. Qiagen, Inc.*, 271 F. Supp. 3d 358, 367–69 (D. Mass. 2017) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008)).  The Federal Circuit thus has held that a district court abuses its discretion in granting preliminary injunctions in patent cases where the evidence does not support claims of irreparable harm. *LEGO A/S*, 2020 WL 229874, at *7–8.

---

[5]  Notwithstanding its accusations of copying, the Zoey being a "knock off" and "cheaper", and purported risk of "confusion in the market" (Mot. at 14), SoClean has not asserted trade dress, trademark or any infringement claims against Sunset, other than the patent infringement claims in its complaint.

*See also Biogen Idec MA Inc. v. Trustees of Columbia Univ.*, 332 F. Supp. 2d 286, 295 (D. Mass. 2004) (irreparable harm cannot be grounded on "conjecture, surmise, or a party's unsubstantiated fears"; "the threat of irreparable harm must be real and 'immediate.'") (quoting *Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) and *Fundicao Tupy S.A. v. U.S.,* 841 F.2d 1101, 1102–03 (Fed. Cir. 1988)).  SoClean fails to meet this standard.

### A.   SoClean's "Lost Market Share" Theories Are Unsupported.

"Lost market share must be proven (or at least substantiated with some evidence) in order for it to support entry of a preliminary injunction, because granting preliminary injunctions on the basis of speculative loss of market share would result in granting preliminary injunctions 'in every patent case where the patentee practices the invention.'"  *Red Bend Ltd. v. Google Inc.*, 2011 U.S. Dist. LEXIS 36217, at *42 (D. Mass. Mar. 31, 2011) (citing *Automated Merch. Sys. v. Crane Co.*, 357 F. App'x 297, 300-01 (Fed. Cir. 2009)).  *See also Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006) ("Evidence of potential lost sales alone does not demonstrate irreparable harm.").  Moreover, "neither the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial."  *Nutrition 21 v. U.S.*, 930 F.2d 867, 871–72 (Fed. Cir. 1991).  *See also Praxair, Inc. v. ATMI, Inc.*, 479 F. Supp. 2d 440, 444 (D. Del. 2007) (no explanation why damages could not compensate for lost market share; "desire to become a monopoly supplier … is hardly unique, and is not conclusive evidence of any factor").

### (1)   The Parties market and sell primarily in different channels.

SoClean's assertion that the Parties will sell solely in the identical market channel is wrong. (*See* Mot. at 14; *see also id.* at 6.)  While SoClean sells in multiple channels (directly to consumers, through mass retailers such as Walmart, and through DMEs (Marcarelli Decl. ¶ 12), Sunset sells in *only one* – the DME channel.  (Slosar Decl. ¶ 6.)  Moreover, SoClean has increasingly marketed

- 14 -

and sold the SoClean 2 directly to consumers, as evidenced by its 2019 marketing campaign featuring William Shatner, and its scaling back of its sales to DMEs. (Marcarelli Decl. ¶ 9; Slosar Decl. ¶ 17 & Ex. 3 thereto.)  SoClean does not state that the DME market is critical to its business, nor does it quantify the percentage of its DME business – likely because it is *de minimis*. (*See* Slosar Decl., Ex. 2 (sales to DMEs are 9% of "B2B"); Martin Decl., Exs. 1-3 (touting global expansion in consumer direct and mass retail markets).)  SoClean instead speculates that "Sunset is *expected* to broaden its marketing . . . through *eventual* online sales" (Mot. at 7 (emphasis added)) – a statement that is unsupported by the Marcarelli Declaration (at ¶¶ 30, 36, 39) and contrary to Sunset's known business model of selling products only to DMEs. (Slosar Dec. ¶¶ 6, 23.)  That there may be some small overlap solely in the DME channel is not a "clear showing" of irreparable harm, particularly where, as here, there is no evidence of any actual lost sales or customers.[6]  *Cf. Edge–Works Mfg. Co. v. HSG, LLC*, 285 F. Supp. 3d 883, 900–01 & n.19 (E.D.N.C. 2018) ("although it appears clear that the parties are in competition with each other, plaintiff has offered no evidence in support of the extent of that competition").[7]

### (2)    SoClean's "lost sales" argument is unsupported.

SoClean argues that "because Sunset's cheaper product also looks remarkably like the SoClean" it will create confusion and "[i]rreparable harm is inevitable as a result". (Mot at 14.)[8] As an initial matter, the assertion that the Zoey looks like the SoClean product is unsubstantiated and simply incorrect (Slosar Decl. ¶ 21), and the suggestion of consumer confusion between the

---

[6]  Any overlap is tiny.  While SoClean has sold over 650,000 units since 2019 (Marcarelli Decl. ¶ 7), the Zoey has only sold approximately 420 units in the first four weeks on the market (Slosar Decl. ¶ 26).
[7] Plaintiff relies on *Metalcraft of Mayville* to claim that irreparable harm is established by the potential loss of a lifelong customer (Mot. at 8-9), but *Metalcraft* does not "stand for the proposition that unsupported assertions regarding these types of evidence is sufficient to find irreparable harm."  *See Edge–Works Mfg.*, 285 F. Supp. 3d at 901 & n.20.  *Abbott Labs*, 544 F.3d at 1361–62 is inapposite (harm from generic drug).
[8]  This "inevitability" argument is just the sort of categorical presumption the Supreme Court rejected in *eBay*.  *See Red Bend*, 2011 U.S. Dist. LEXIS 36217, at *56.

two products is entirely speculative and inconsistent with SoClean's representation that it has spent over $40 million to build brand recognition.  (Mot. at 4.) [9]  In *LEGO A/S v. ZURU Inc.*, the district court granted a preliminary injunction based in part on the finding "that LEGO's bricks . . . and the [accused bricks] are virtually indistinguishable and that, as a result, LEGO is at risk of losing sales and market share to the defendant."  2020 WL 229874, at *7–8.  The Federal Circuit reversed because, as here, there was no *evidence* of such confusion or loss of market share.  *Id.  See also Precision Links Inc. v. USA Products Group, Inc.*, 527 Fed. App'x. 852, 857 (Fed. Cir. 2013) (affirming no irreparable harm; that customers could "mistake [defendant's products] for Precision's similar-looking invention" was "based on pure speculation by its owner").

SoClean's statement that it was already "losing sales in just one month and feeling pressure to lower its prices" (Mot. at 16) is unsupported.  The Marcarelli Declaration (including cited ¶¶ 32-38) merely advances conclusory statements that SoClean "undoubtedly" will be harmed, including by ***other, unidentified infringers***.  SoClean's argument additionally fails because it never addresses the size of the market, its own market share, or the existence of other competitors.  *See Edge–Works Mfg.*, 285 F. Supp. 3d at 900–01 (no irreparable harm where plaintiff speculated lost sales from defendant's product release at a trade show, but provided no "evidence regarding [plaintiff's] share of the market or how plaintiff's market is similar or different than defendant's market").  SoClean does not claim to be the only business selling CPAP cleaning devices or even automated devices.  In fact, numerous competitors in the CPAP cleaning device market compete for consumers seeking CPAP cleaning solutions.  *See Advanced Cardiovascular Sys. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 560 (D. Del. 2008) (no irreparable harm where there were at

---

[9]  Notwithstanding its accusations of copying, the Zoey being a "knock off" and "cheaper", and purported risk of "confusion in the market" (Mot. at 14), SoClean has not asserted trade dress, trademark or any infringement claims against Sunset, other than the patent infringement claims in its complaint.

least two other competitors, and no evidence of specific, likely lost customers).   Nor does SoClean's assertion that these purported lost sales will be "difficult to precisely and fully quantify" (Mot. at 14) suffice to show that monetary damages would be insufficient.[10]

In short, SoClean's conclusory statements do not establish a "clear showing" of likely irreparable harm from lost sales or market share.  *See*, *e.g.*, *Oxford Immunotec Ltd.*, 271 F. Supp. 3d at 367–69; *Red Bend.* 2011 U.S. Dist. LEXIS 36217, at *42; *Nutrition 21*, 930 F.2d at 871.

### B.     SoClean's Price Erosion Claim Is Wholly Conclusory.

SoClean's price erosion "claim" (*see* Mot. at 14, 16) is a handful of conclusory sentences devoid of any *evidence* of an immediate likelihood of irreparable harm.  (*See* Marcarelli Decl. ¶ 40 ("SoClean may have to lower its retail price" including on "future potential products").  Such "conclusory statements that price erosion is possible" fail to demonstrate irreparable harm.  *See Automated Merch. Sys.*, 357 F. App'x at 300-01.[11]  Moreover, SoClean concedes that it previously sold the SoClean for the identical $299 price, and claims that it raised its price from $299 to $348 solely to cover marketing costs.  (Marcarelli Decl. ¶ 30.)  SoClean's exorbitant marketing costs and price increase was its own business decision.  SoClean also fails to explain how its resultant brand recognition from this advertising spend would be immediately eroded by the Zoey.[12]

---

[10]   SoClean's suggestion that it could be harmed by the loss of sales of replacement cartridges (Mot. at 8) is speculative and inconsistent with its acknowledgement of numerous counterfeit cartridges in the market (*id.* at 5).   *See Precision Automation, Inc. v. Tech. Services, Inc.*, No. 07-cv-707-AS, 2007 WL 4480739, at *4-7 (D. Or. Dec. 14, 2007) (declarations asserting "unquantifiable" sales losses, including of "unpatented ancillary items made as a result of the sale of a patented" product, were speculative absent "evidence in the record such as customer statements, sales data, or market-share information").

[11]   One of SoClean's cited cases demonstrates the type of evidence that may be sufficient to show irreparable harm from price erosion.  *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930–31 (Fed. Cir. 2012) (affirming preliminary injunction based on substantial evidence including "specific financial records"; "significantly discounted prices as well as specific instances when customers purchased from [defendant] instead of Celsis"; and expert testimony, among other evidence).

[12]   SoClean's other cited cases (*see* Mot. at 14-16) involve substantial showings of irreparable harm for a *permanent* injunction on a fully developed record and addressed distinct markets from that here.  *See Apple Inc. v. Samsung Electronics Co., Ltd.*, 809 F.3d 633, 640–42 (Fed. Cir. 2015) ("fierce" competition between parties); *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Circ. 2008) (considering historical

### C.   References to Loss of Goodwill and Reputational Injury are Conclusory.

SoClean makes only conclusory statements as to how it will experience any loss of goodwill or reputational injury (Mot. at 15-16) (*see, e.g.*, Marcarelli Decl. ¶ 30), and notably does not claim that the Zoey is an inferior product.  *See Edge–Works Mfg.*, 285 F. Supp. 3d at 903 (rejecting reputational harm where "no evidence has been provided that defendant's products are considered less prestigious and innovative"); *Red Bend*, 2011 U.S. Dist. LEXIS 36217, at *42 (patent holder failed to show likely loss of goodwill where it presented "no evidence that its reputation has been tarnished" and rejecting "mere general statements" of same).

## IV.   The Balance of Hardships Favors Denial of a Preliminary Injunction.

For this prong, SoClean again relies primarily on a patentee's right to exclusivity, claiming that its market status will be damaged.   (*See* Mot. at 17.)   But SoClean's cases address distinguishable market contexts where there is a direct trade-off of harm and gain between competitors.  *See Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1170-71 (Fed. Cir. 2014) (involving tiny sod harvester market with only three competitors); *Abbott Labs*, 544 F.3d at 1362 (addressing unique context of competition to a patented pharmaceutical from an infringing generic drug).  SoClean also offers no evidence to support its theory that the failure to enjoin Sunset will encourage other infringers.  (Mot. at 17; Marcarelli Decl. ¶ 40).  Courts have rejected similar arguments, observing that that allegation, without more support, "applies to every patent

---

licensing experience in analyzing potential reasonable royalty); *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1336–38 (Fed. Cir. 2013) (harm due to unique, "design-win" market, distinct from typical consumer goods market); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Circ. 2012) (evidence that companies shared customers, occupied the same markets, and at times plaintiff was the only competitor); *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1344-45 (Fed. Cir. 2013) (patent holder presented evidence that infringing products were inferior and had been marketed as the plaintiff's "at half the price"); *Contour Design, Inc. v. Chance Mold Steel Co., Ltd.*, 2010 U.S. LEXIS 121761, at *33-34 (D.N.H. 2010) (breach of exclusive manufacturing contract caused two-year manufacturing delay, loss of customers and goodwill).

case where a patentee seeks a preliminary injunction against a competitor." *See Edge–Works Mfg.*, 285 F.Supp.3d at 903; *Precision Automation, Inc.* 2007 WL 4480739, at \*4-7.

By contrast, the hardships Sunset will face if an injunction is granted are greater and more imminent.  An injunction will cause Sunset to shut down all manufacturing of the Zoey; undermine Sunset's relationship with key suppliers, potentially interrupt the supply chain for Sunset products not at issue here, and erode Sunset's credibility and reputation within the industry and with its customers and employees.  (Slosar Decl. ¶¶ 27-31.)  SoClean downplays any harms Sunset will experience because it is new market entrant (Mot. at 17-18), but this ignores Sunset's established DME business – its sole sales channel – will be substantially undermined if Sunset is enjoined. (Slosar Decl. ¶¶ 6, 23.)  Moreover, contrary to SoClean's assertion that Sunset knowingly infringed, the contention that Sunset sought a "work around" (Mot. at 18) shows that Sunset sought to *avoid* infringing SoClean's patents.[13]  Indeed, designing around a patent is not only permissible, it is encouraged.  *See State Indus. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) ("One of the benefits of a patent system is its so-called 'negative incentive' to 'design around' a competitor's products, even when they are patented, thus bringing a steady flow of innovations to the marketplace[.]").[14]

---

[13]  SoClean's claim that Sunset told customers that it was taking "a calculated risk of infringing SoClean's patents" (Mot. at 18) is unsupported (*see* Marcarelli Decl. ¶ 29).

[14]  SoClean's cited cases, where the defendant had knowledge of the patent but no legitimate infringement defense, are inapplicable here, where Sunset vigorously contests infringement.  *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) (defendant *admitted* to infringement); *Celsis*, 664 F.3d at 926, 931 (district court rejected non-infringement arguments as "hokum").  SoClean mischaracterizes *Indivior Inc.,* 752 Fed. Appx. at 1035, 1041, citing a dissent, rather than the majority holding, which reversed the preliminary injunction in part because the infringement claim was likely barred by claim preclusion from a prior holding that defendant's products did not infringe an "indistinct" patent.  SoClean's other cases (Mot. at 17-18) are inapposite because they deal with, *e.g.*, constitutional violations (*Vaqueria Tres Monjitas*) and breach of a franchise agreement (*Dunkin' Donuts*).

**V.     The Public Interest in Health Favors Denial of a Preliminary Injunction.**

There undoubtedly is a strong public interest in making a variety of medical devices with different potential advantages available to patients, such as the Zoey.  (Slosar Decl. ¶ 21; *see* Mot. at 3-4.)  The public interest in such access outweighs a patentee's interest in exclusivity.  *See Smith & Nephew, Inc. v. Interlace Med., Inc.*, 955 F. Supp. 2d 69, 80 (D. Mass. 2013) (cited by SoClean, Mot. at 19).  At the very least, "[t]here are surely off-setting public interests at play in this case and thus it is not a controlling factor."  *See Oxford Immunotec Ltd.*, 271 F. Supp. 3d at 370 (weighing public interest in tuberculosis diagnostic kit against patent rights).[15]

<u>Conclusion</u>

For the foregoing reasons, Defendant Sunset Healthcare Solutions, Inc., respectfully requests that the Court deny Plaintiff's Motion.

Dated: February 25, 2020                     Respectfully submitted,

                                             Sunset Healthcare Solutions, Inc. Inc..
                                             By its attorneys,

                                             /s/ Andrea L. Martin
                                             Andrea L. Martin (BBO #666117)
                                             amartin@burnslev.com
                                             Burns & Levinson LLP
                                             125 High Street
                                             Boston, MA 02110
                                             (617) 345-3000
                                             (617) 345-3299 (fax)

---

[15] SoClean's cases (Mot. at 17-18) here (*Veracode*, *Contour Design*, *Douglas Dynamics*) are likewise inapposite because they did not involve public health considerations, whilet he discussion of balancing in *Mallinckrodt, Inc. v. Masimo Corp.*, 147 Fed.Appx. 158, 177 (Fed. Cir. 2005) relied on the now-overturned *MercExchange, L.L.C. v. eBay, Inc.*, 401 F.3d 1323, 1338 (Fed. Cir. 2005).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, February 25, 2020, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

 /s/ Andrea L. Martin
Andrea L. Martin

4812-0941-9190.2