UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-----------------------------------------------------------X

SOCLEAN, INC.

    Plaintiff,

- against -

                                        Case No. 1:20-cv-10351-IT

SUNSET HEALTHCARE SOLUTIONS, INC.      **Leave to File Granted on 02/26/20**

    Defendant.

-----------------------------------------------------------X

**REPLY IN SUPPORT OF PLAINTIFF'S
EMERGENCY MOTION FOR AN EX PARTE
TEMPORARY RESTRAINING ORDER AND/OR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

                                                                                               **Page**

I.    Sunset Has Not Created a "Substantial Question" Regarding Whether It Infringes Claim 1 of the '205 Patent. ...................................................................................................1

II.   SoClean Will Face Irreparable Harm from Sunset's Infringing Sales. ...............................4

    A.    Sunset's Marketing of a Cheaper, Infringing Product in the DME Channel Will Cause Irreparable Harm to SoClean Across all Sales Channels. .....................5

    B.    The Zoey is the Only Comparable Competitor to SoClean. ...........................................6

    C.    Sunset's Assertions Regarding its own Alleged Irreparable Harm are a Red Herring. ............................................................................................................................7

CONCLUSION ................................................................................................................................8

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
    717 F.3d 1336 (Fed. Cir. 2013)......................................................................................4

*Dunkin' Donuts Franchised Rests. LLC v. ABM Donuts, Inc.*,
    2011 U.S. Dist. LEXIS 139074 (D.R.I. 2011) ...............................................................7

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
    909 F.2d 1464 (Fed. Cir. 1990).......................................................................................2

*Metalcraft of Mayville, Inc. v. Toro Co.*,
    848 F.3d 1358 (Fed. Cir. 2017).......................................................................................4

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
    764 F.3d 1392 (Fed. Cir. 2014).......................................................................................3

*Momenta Pharms., Inc. v. Amphastar Pharms., Inc.*,
    834 F. Supp. 2d 29 (D. Mass. 2011) ...............................................................................6

*Sanofi-Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006).......................................................................................7

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001).......................................................................................1

Sunset challenges SoClean's request for a preliminary injunction on only two grounds: (1) that Sunset has created a "substantial question" of infringement, and (2) that SoClean has failed to show irreparable harm. As explained below, neither of these arguments have merit, and the requested preliminary injunction should issue.

## I. Sunset Has Not Created a "Substantial Question" Regarding Whether It Infringes Claim 1 of the '205 Patent.

Sunset has not created a "substantial question" of infringement regarding claim 1 of the '205 patent. To the contrary, its statements—and its expert's corroborative declaration—confirm that the Zoey Connector Unit infringes the asserted claims of the '205 patent.

Sunset's opposition is largely an attempt to obfuscate a clear case of infringement. To that end, Sunset first impermissibly narrows the scope of the asserted claims by importing embodiments of the invention—i.e., non-limiting *examples* of the invention—into the claims. Opp. at 9-11. Yet it is a "cardinal sin" of patent law to read a limitation from the patent's specification into the claims. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340-41 (Fed. Cir. 2001). Second, Sunset attempts to narrow the claims by limiting them to the SoClean 2 device. Opp. at 11. This, too, is prohibited, because the SoClean 2 is simply a commercial embodiment—again, an *example*—of the claimed invention. Third, Sunset inaccurately describes the Zoey Connector Unit's structural details, by suggesting it exists as two separate pieces. Opp. at 12. But as the Zoey Connector Unit drawings and Sunset's own expert demonstrate, the two "disassembled" components are "ultrasonically welded" together. Liebschner Decl. ¶¶ 63, 105; Exhibit 15. Fourth, Sunset's reliance on the *operation* of the Zoey Connector Unit to suggest non-infringement is irrelevant to asserted claim 1, *see* Opp. at 12 (discussing delivery of ozone gas), because apparatus claims "cover what a device *is*, not what a

device *does*." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990) (emphasis added).

Once one wades through these distractions, the infringement issue hinges on only two questions: (1) does the Zoey Connector Unit include a second passageway that "extends through" a wall, and (2) is the Zoey Connector Unit's second passageway "partially disposed" in a first passageway? Opp. at 11-13 (alleging non-infringement based on these two grounds). The answer to both is unequivocally "yes."

As to the first question, Defendant's analysis is flawed from the start, because it relies on a two-piece, disassembled configuration of the connector unit. Opp. at 11-13. Defendant's own expert admits that the components are "welded" together, into a single unit. Liebschner Decl. ¶63. "Welding" two things together unites them as one. And examination of the welded configuration of the single-component Zoey Connector Unit demonstrates infringement. For example, the following figure shows that the second passageway begins on the *outside* of the Zoey Connector Unit, and ends *inside* the wall of the Zoey Connector Unit:



Sunset even *agrees* with this interpretation. Opp. at 10 (stating that "the second passageway enters on one side of the wall of the connector unit and goes out the other side" is an example of "through"); *id*. at 11 (using a picture of SoClean 2 to demonstrate that the second passageway's "entry" and "exit" from the wall of the connector unit is an example of "through"). This alone

demonstrates infringement, using Sunset's own interpretation of "through" and "wall." *See* Opp. at 9, 10. Moreover, staring down the barrel of the first passageway of the Zoey Connector Unit (left) and the SoClean 2 (right) illustrates the same; namely, that the second passageway begins *outside* the wall of the connector unit, and ends on the *inside* of the connector unit. Because Sunset and its expert agree that the SoClean 2 satisfies the "extends through" limitation, *see* Opp. at 10-11, they cannot deny that the Zoey does as well.

 

In sum, an accurate cross-section of the assembled, single-component Zoey Connector Unit depicts a second passageway that begins on the outside of the connector unit wall and ends on the inside of the connector unit wall:



As to the second question, Sunset glosses over the critical fact that the words "at least partially" immediately precede the words "disposed within" in claim 1 of the '205 patent. This is legal error. *Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1399 (Fed. Cir. 2014) (favoring a construction that does not render another limitation superfluous). Sunset agrees that the SoClean 2's second passageway is "disposed within" the first passageway. Opp. at 11. If

that is true, then a simple look at the Zoey Connector Unit's second passageway reveals that it is "*at least partially* disposed within" the first passageway, as shown in the figure below. Nothing further is required to infringe this claim element.



## II. SoClean Will Face Irreparable Harm from Sunset's Infringing Sales.

Sunset's assertion that SoClean "has presented no *facts* that show it has been or will be irreparably harmed," Opp at. 12 (emphasis in original), is an attempt to belittle the collection of regularly recognized, "often irreparable" harms that patents are designed to deter. *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) (a patentee need not be "forced to compete against products that incorporate and infringe [the patentee's] own patented inventions"). Denigrating the sworn-to facts in the declaration of SoClean's Chief Marketing Officer ignores the entire point of a preliminary injunction: that "[w]here the injury cannot be quantified, no amount of money damages is calculable, and therefore the harm cannot be adequately compensated and is irreparable." *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017). In truth, SoClean *has* presented relevant facts to support its irreparable harm argument, while Sunset has attempted to minimize these facts using false and irrelevant facts of its own. The three most glaring examples are rebutted below.

### A. *Sunset's Marketing of a Cheaper, Infringing Product in the DME Channel Will Cause Irreparable Harm to SoClean Across <u>all</u> Sales Channels*.

Sunset's primary irreparable harm argument—that "the Parties market and sell primarily in different channels," Opp. at 14—is false on two levels. First, it is factually false: Both Sunset *and* SoClean sell a significant number of devices directly to and through DMEs. Unable to deny that SoClean sells to DMEs, Sunset suggests that these sales (and corresponding harm) are *de minimis*. But even if the Court accepts Sunset's figures as "fact," that still equates to almost $20 million dollars, based on SoClean's approximately $190 million total revenue in 2019. Marcarelli Supp. Decl. ¶ 5.  Therefore, SoClean faces a serious risk of irreparable harm *even if* only 9% of its business were based on sales to DMEs. More importantly, Sunset's 9% figure is wrong: in reality, approximately 50% of SoClean devices sold to consumers go through DMEs. *Id*. ¶ 6. Sunset's 9% figure fails to account for SoClean sales to distributors who in turn sell to DMEs. *Id*. ¶ 6. Sunset's presence in the DME channel—where it sells a cheaper, infringing product—directly and detrimentally affects *all* of these DME-mediated sales. *Id*. ¶ 7.

Second, Sunset's "different channels" argument misses the point (regardless of which percentage the Court credits), in that competing with Sunset in the DME channel will force SoClean to lower prices across *all* channels. Marcarelli Supp. Decl. ¶ 8. The logic is simple: if SoClean lowers DME prices to compete with Sunset, then it must *also* lower direct-to-consumer prices; otherwise, consumers will buy either the lower-priced DME-supplied SoClean (which has lower profit margins for SoClean) or the lower-priced Zoey (which has no profit at all for SoClean). *Id*. ¶ 9. In other words, Sunset's distinction between DME and direct-to-consumer channels is irrelevant; it is the *consumer* that matters, not the sales channel. *Id*.

If Sunset continues selling its cheaper, infringing product in the DME channel (even at 9%), SoClean will be forced to lower prices across *all* channels in order to compete. Marcarelli

5

Supp. Decl. ¶ 8. While it is difficult to calculate the total damage that a $50 price drop would have on SoClean, that damage would be irreparable. For example, SoClean's sales are driven by its extensive advertising, which is made possible by its current price point. *Id*. ¶ 10. If SoClean is forced to lower prices, not only will its margins and profits deteriorate, but SoClean will also not be able to support its current advertising, thus losing sales and revenue, and further impacting future products and sales, and could potentially lead to layoffs. *Id*. In short, if SoClean does not advertise, it does not sell product. *Id*. This is exactly the type of price erosion that irreparably harms patent holders, and for which preliminary injunctions are warranted. *Momenta Pharms., Inc. v. Amphastar Pharms., Inc.*, 834 F. Supp. 2d 29, 31 (D. Mass. 2011) ("[A]llowing Amphastar to enter a market in which plaintiffs sold the only [comparable] product would result in harm to plaintiffs in the form of price erosion.").

### B. The Zoey is the Only Comparable Competitor to SoClean.

Sunset faults SoClean for not addressing the "existence of other competitors" in the "CPAP cleaning device market." Opp. at 16. Broadly speaking, there are indeed other "CPAP cleaning devices." However, the SoClean is the only automated, stand-alone device that connects directly to a CPAP device, and uses ozone to disinfect the mask, hose, *and* reservoir. Marcarelli Supp. Decl. ¶ 11. Before the Zoey, only the SoClean 2 was able to easily and effectively clean all parts of a CPAP device, as all other "competitor" devices require multiple cleaning or processing steps, and/or disassembly of the CPAP device. If a consumer wants to automatically disinfect their CPAP device with ozone, but does not want the hassle of taking it apart, then they have only two options: the SoClean or the Zoey. *Id*. ¶ 12. This ease-of-use is exactly why Sunset chose to infringe SoClean's patented inventions, as these inventions make easy, one-step cleaning possible. Thus, each Zoey sale would have otherwise been a SoClean sale. And each of

those sales robs SoClean of market share, revenue to invest in future products and advertising, and future convoyed sales of replacement parts (e.g. filters). Marcarelli Decl. ¶ 40. Sunset rides free on the coattails of the market that SoClean built at substantial cost. *Id.* ¶ 31.

### C. Sunset's Assertions Regarding its own Alleged Irreparable Harm are a Red Herring.

Sunset asserts that an injunction would visit "greater and more imminent" harms to Sunset than SoClean. Opp. at 19. This is misleading on several levels. First, SoClean sells one product: the SoClean 2. Marcarelli Supp. Decl. ¶ 4. It has no other source of revenue. *Id.* In contrast, Sunset admits that only *half* of its business is "the manufacture and sale of its own products," while the other half is "distribution of other equipment manufacturer's products, such as SoClean." Opp. at 2. Any loss to Sunset from being unable to sell its infringing Zoey product is therefore only a *portion* of a *half* of its business (and a small portion at that), whereas SoClean's product comprises *all* of its *entire* business. Moreover, Sunset is not the "small" competitor that it portrays itself to be. Sunset's $40-50 million yearly revenue—not including sales of the Zoey—is neither inconsequential nor suggestive of a start-up player in the market. Marcarelli Supp. Decl. ¶ 13.

Second, at minimum, Sunset knowingly risked infringing the patents. Thus, any harm to Sunset was "almost entirely preventable," and "the result of its own calculated risk to launch its product pre-judgment." *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) (affirming preliminary injunction); *Dunkin' Donuts Franchised Rests. LLC v. ABM Donuts, Inc.*, 2011 U.S. Dist. LEXIS 139074, at *20-21 (D.R.I. 2011) ("[A]ny harm to Defendants is completely self-inflicted and thus cannot be deemed irreparable as a matter of law").

## **CONCLUSION**

For the reasons stated above and in SoClean's initial motion, the Court should issue a preliminary injunction in favor of SoClean to remedy Sunset's past infringing sales of the Zoey product and further plans to market and sell it throughout the United States.

DATED: February 27, 2020

Respectfully submitted,

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.

/s/ *H. Joseph Hameline*
H. Joseph Hameline (BBO No. 218710)
Thomas H. Wintner (BBO No. 667329)
Clancy Galgay (BBO No. 673116)
One Financial Center
Boston, MA 02111
Tel:  (617) 348-3000
Fax:  (617) 542-2241
HJGalgay@mintz.com
TWintner@mintz.com
CGalgay@mintz.com

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I certify that on February 27, 2020, I filed a copy of the foregoing document by electronically filing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all CM/ECF registered users.

DATED: February 27, 2020         Respectfully submitted,

     /s/ *H. Joseph Hameline*
H. Joseph Hameline (BBO No. 218710)
Thomas H. Wintner (BBO No. 667329)
Clancy Galgay (BBO No. 673116)
One Financial Center
Boston, MA 02111
Tel: (617) 348-3000
Fax: (617) 542-2241
HJHameline@mintz.com
TWintner@mintz.com
CGalgay@mintz.com

*Attorneys for Plaintiff*